**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

THE ESTATE OF DOMINICK
MILIA, deceased, by and through
EUGENIO S. MATHIS, personal
representative of the estate,

    Plaintiff,

v.

CORECIVIC OF TENNESSEE d/b/a CORECIVIC, INC;
CORRECTIONAL MEDICINE ASSOCIATES, P.C.;
CIBOLA GENERAL HOSPITAL, INC.,
CHIEF MECIAL OFFICER KEITH IVENS, MD;
OFFICER WILLIAM SNODGRASS; OFFICER [FNU]
BULLOCK; WARDEN ROBERT NILIUS; and
GINGER VAUGHN, MD

    Defendants.

No.

_____

**JURY REQUESTED**

**COMPLAINT FOR VIOLATIONS OF RIGHTS UNDER**
**THE UNITED STATES CONSTITUTION**

    Plaintiff Estate of Dominic Milia, by and through Eugenio S. Mathis, personal representative of the estate ("Mr. Milia" or "Plaintiff"), by his attorneys, Guebert Gentile Piazza & Junker P.C., and Collins & Collins, P.C., and pursuant to 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 2201 and 2202, brings this action (the "complaint") to redress violations of Dominic Milia's Eighth and Fourteenth Amendment rights under the United States Constitution, and alleges, based on personal knowledge as to his own experiences and otherwise on information and belief, as follows:

**PRELIMINARY STATEMENT**

1

CoreCivic and Cibola General Hospital Corp., acting through their respective employees, staff, and agents, knew that Mr. Milia was at high risk of developing endocarditis and that he was suffering from increasing and debilitating pain that was not ameliorated over time or through pain medication. Yet, Defendants deliberately and recklessly ignored an emergent infection and Mr. Milia's high risk of endocarditis, including a mini stroke and fainting. Mr. Milia made numerous efforts to seek medical attention, all of which were ignored or taken with little to no consideration for Mr. Milia's health. Mr. Milia's prolonged pain and suffering spanned over 46 days until his death on March 11, 2022. Mr. Milia's injuries, and prolonged pain and suffering were, in part, the result of CoreCivic's widespread pattern and practice of failing to provide constitutionally adequate medical care and effectively denying patients access to medical care. His injuries and suffering were also caused, in part, by Cibola General Hospital's longstanding pattern and practice of responding with deliberate indifference to the failures of its medical employees, staff, and agents to provide constitutionally adequate medical care to Cibola County Correctional Center ("CCCC") prisoners. The actions and inactions of Defendants violated Mr. Milia's rights secured by 42 U.S.C § 1983 under the Eighth and Fourteenth Amendments to the United States Constitution.

**PARTIES, JURISDICTION, & VENUE**

1.      This is a civil action authorized by: 42 U.S.C. § 1983 to redress the deprivation, under color of law, of substantive due process rights secured by the Fourteenth Amendment of the United States Constitution, and by **42 U.S.C. § 12132 and 29 U.S.C. § 794,** Section 504 of the Rehabilitation Act of 1973, **for discrimination on the basis of disability.**

2.      Subject matter jurisdiction is conferred by 28 U.S.C. § 1331.

3.      The United States District Court of New Mexico is an appropriate venue under 28 U.S.C. § 1391(b)(2) because the events giving rise to this claim occurred in New Mexico.

4.      Plaintiff Eugenio Mathis is a resident of San Miguel County, New Mexico, and is the personal representative of the Estate of Dominic Milia. *See In re: Dominic Milia*, D-412-CV-2022-00106. Plaintiff brings this action on behalf of the Estate of Dominic Milia. Dominic Milia was a pre-adjudication detainee at Cibola County Correctional Center (CCCC) under the care and custody of Defendants while awaiting trial.

5.      Defendant CoreCivic of Tennessee, d/b/a CoreCivic, Inc. (CoreCivic), is a private, for-profit corporation that receives federal funding. CoreCivic was specifically organized to operate, staff, and manage prison facilities. For purposes of this claim, CoreCivic operated out of Milan, Cibola County, New Mexico. At all relevant times, Defendant CoreCivic employed, retained, trained, and exercised direct control over the individually named Defendants who were employees, contractors and/or agents of CoreCivic. CoreCivic is headquartered in Brentwood, Tennessee.

6.      Defendant Correctional Medicine Associates, P.C. (CMA) is a private, for-profit corporation that receives federal funding. Upon information and belief, CMA is organized as a subsidiary of, partner to, or joint venture with CoreCivic to employ certain medical staff to provide direct care to detainees and to supervise CoreCivic medical staff in the provision of care to detainees. At all relevant times, Defendant CMA employed, retained, trained, and exercised direct control over the individually named Defendants who were employees, contractors and/or agents of CMA. CMA is believed to be headquartered in Brentwood, Tennessee.

7.      Defendant Cibola General Hospital, Inc., is a domestic corporation that receives federal funding. Cibola General's principal place of business is: 1016 E. Roosevelt Ave., Grants, New Mexico. At all relevant times, Cibola General operated, supervised, directed, and controlled Cibola General Hospital (Cibola General) in Grants, New Mexico.

8.      Defendant Robert Nilius was, at the time of Dominic Milia's death, Warden of CCCC. Defendant Nilius had a non-delegable duty to ensure that the CCCC met Constitutional standards. Defendant Nilius also had a non-delegable duty to ensure that individuals in custody at CCCC were safe, free from mistreatment and unnecessary pain and suffering, and that each individual received medical care, among other things. As Warden of CCCC, Defendant Nilius also had a duty to avoid the creation or enforcement of any policy that caused constitutional violations to detainees, including Dominic Milia. Finally, Defendant Nilius, as Warden of CCCC, had a duty to act when he learned of an ongoing constitutional violation pertaining to any detainee, including Dominic Milia.

9.      Defendant Correctional Officer William Snodgrass was, at the time of Dominic Milia's death, a Captain and Shift Supervisor employed by CoreCivic at CCCC. At all times material to this lawsuit, Defendant Snodgrass had a duty to ensure that detainees housed under his supervision, including Dominic Milia, were safe, free from unwanted and unnecessary pain and suffering, and that they received medical care if the medical condition was sufficiently serious that it would have been obvious that even a lay person would easily recognize the necessity for a doctor's attention. Defendant Snodgrass also had a duty to ensure Mr. Milia was not in constant pain and suffering, and to ensure that the lack of medical care would not result in an increase in his injuries. Finally, as a supervisor of other correctional officers and staff, Defendant Snodgrass had a duty to 1) avoid the creation or enforcement of any policy that caused constitutional violations to detainees, including Dominic Milia; and 2) act when he learned of an ongoing constitutional violation pertaining to any detainee, including Dominic Milia.

10.     Defendant Bullock was, a at the time of Dominic Milia's death, a supervising officer employed by CoreCivic and working at CCCC. At all times material to this action,

4

Defendant Bullock had a duty to ensure that detainees housed under his supervision, including Dominic Milia, were safe, free from unwanted and unnecessary pain and suffering, and that they received medical care if the medical condition was sufficiently serious that it would have been obvious that even a lay person would easily recognize the necessity for a doctor's attention. Defendant Bullock also had a duty to ensure Mr. Milia was not in constant pain and suffering, and to ensure that the lack of medical care would not result in an increase in his injuries. Finally, as a supervisor of other correctional officers and staff, Defendant Bullock had a duty to 1) avoid the creation or enforcement of any policy that caused constitutional violations to detainees, including Dominic Milia; and 2) act when he learned of an ongoing constitutional violation pertaining to any detainee, including Dominic Milia.

11.     Defendant Keith Ivens, MD, was, at the time of Dominic Milia's death, an employee and agent of CoreCivic and/or CMA. Upon information and belief, Defendant Ivens was the Chief Medical Officer of CoreCivic and the on-site medical doctor supervising the medical staff at CCCC. Additionally, Ivens was responsible for approving "clinical pathways for various diseases and medical policies" by the medical staff at CCCC. At all times material to this action, Defendant Ivens had a duty to ensure that detainees treated under his supervision, including Dominic Milia, received medical care that was objectively reasonable. As a supervisor of medical officers and staff, Defendant Ivens had a duty to 1) avoid the creation or enforcement of any policy that caused constitutional violations to detainees, including Dominic Milia; and 2) act when he learned of an ongoing constitutional violation pertaining to any detainee, including Dominic Milia.

12.     Defendant Ginger Vaughn, MD, was, at the time of Dominic Milia's death, a medical doctor at Cibola General Hospital emergency department. Upon information and belief,

Defendant Vaughn resides in New Mexico.

13.    At all relevant times, the individual Defendants acted under the color of law within the scope of their duties and employment.

## FACTUAL BACKGROUND

### *Duties of a Private Detention Facility*

14.    Prison corporations that operate private detention facilities by agreement with the federal, state or local governments remain subject to constitutional, statutory, and contractual obligations.

15.    Private detention facilities must maintain a secure facility that prevents harm to staff and incarcerated individuals.

16.    Private detention facilities must train staff in emergency response protocols.

17.    Private detention facilities must provide sufficient supervision and staffing levels to prevent harm, per contractual and constitutional requirements.

18.    Private detention facilities must deliver constitutionally adequate medical care in compliance with the Fourteenth Amendment.

19.    Private detention facilities must adhere to national standards of medical care, including access to physicians, nurses, and specialists when needed.

20.    Private detention facilities must ensure timely response to medical emergencies and chronic care needs.

21.    Private detention facilities must maintain proper medical recordkeeping and ensure continuity of care.

22.    Private detention facilities must adhere to federal laws to ensure accommodations and protection from abuse.

23.     Private detention facilities must provide access to grievance procedures and legal resources.

24.     Medical providers in any correctional facility have a duty to screen, diagnose, and provide timely, adequate medical care, including crisis intervention, chronic disease management, and continuity of care.

### Cibola County Correctional Center

25.     CoreCivic, a private for-profit prison corporation owns and operates the Cibola County Correctional Center (CCCC), located in Milan, New Mexico.

26.     CCCC was originally under contract with the Federal Bureau of Prisons (BOP) to house federal inmates. However, in 2016, the BOP terminated its contract with CCCC due to concerns over inadequate medical care and multiple inmate deaths.

27.     CCCC has a capacity of approximately 1,145 individuals. Most individuals housed at CCCC are under the jurisdiction of Cibola County, the U.S. Marshals Service, U.S. Immigration and Customs Enforcement (ICE), or The Pueblo of Santa Ana.

28.     Between January 31 and February 2, 2022, the American Commission on Accreditation (ACA) conducted a scheduled evaluation of CCCC. The findings of the ACA committee revealed multiple healthcare staff vacancies, including two FTE mental health practitioners, eight RN positions, and one FTE physician position. *See Reaccreditation Audit*, Commission on Accreditation for Corrections Standards Compliance (Jan. 31 – Feb. 2, 2022).

29.     The ACA committee noted that clinical management of medical services at CCCC is provided by a "corporate physician who approves clinical pathways for various diseases and medical policies." ACA's report further explained that this "corporate medical director" also

happened to be both CCCC's physician, with 24-40 hours per week devoted to their position at CCCC.

30.    Upon information and belief, this "on-site physician" in January through March 2022 was Defendant Keith Ivens, MD.

31.    In August 2022, a federal oversight office conducted an unannounced inspection of CCCC. Results of the unannounced inspection were released in an October 2023 report ("OIDO Report").[1]

32.    The OIDO Report revealed CCCC's medical staff had a 36 percent vacancy rate as of August 2022. According to the Report, the low staffing levels likely contributed to deficiencies found in the provision of medical services to detainees, including delays in distributing prescribed medications and improper monitoring and follow-up for prescribed psychiatric medications.

33.    CCCC's procedures for placement of detainees in segregation were also found to be deficient by the inspectors. Specifically, the inspectors found that CCCC medical staff failed to complete necessary forms for detainees placed in segregation, and facility management failed to ensure completeness and correctness of those forms. According to the OIDO Report, the failure to complete this documentation puts detainees in danger of inappropriate placement and retention in segregation.

_____

[1] *See OIDO-23-013 Cibola County Correctional Center August 9-11, 2022*, David D. Gersten Acting Ombudsman Office of the Immigration Detention Ombudsman (Oct. 23, 2023), at https://www.dhs.gov/sites/default/files/2023-12/23_1013_OIDO%20_Final-Inspection-Report-Cibola-County-Correctional-Center.pdf. Although the inspection was performed by an entity charged with oversight of ICE detainees, the findings regarding medical staffing, pharmaceutical services would apply to other detainees, since these services are provided by the same staff. Arguably, the deficiencies spotted in segregation procedures also apply to other detainees, since the standard procedures appear to be consistent, regardless of detainee status and CCCC's internal segregation policies do not appear to differentiate between detainees.

34.    Finally, the OIDO report calls out CCCC for lapses in training and documentation, particularly in areas of pharmaceutical medication handling, medical records, and documentation of staff credentials and certifications.

***Prevalence of Drugs at CCCC***

35.    In recent years, CCCC has become notorious for drug trafficking and widespread drug use among inmates.

36.    CCCC's issues with drugs became so severe that federal judges in the District of New Mexico and the United States Marshals Service and brought their concerns to the United States Attorneys' Office and the Federal Bureau of Investigation (FBI).

37.    The FBI Albuquerque Division Violent Gang Task Force investigated the CCC and uncovered a complex and lucrative drug trafficking network within CCCC.

38.    Specifically, members of prison gangs at CCCC had been working with associates outside of prison, along with CCCC employees, to smuggle drugs and other contraband into CCCC.

39.    According to a search warrant affidavit, FBI Special Agent Jordan Spaeth found that the CCCC's drug problem was a "startling anomaly" among New Mexico's detention centers due to the "sheer volume of controlled substances being trafficked within the facility."

40.    In 2021, multiple instances were recorded in which tennis balls containing drugs were thrown over the fence of CCCC from outsiders. On at least one occasion, inmates were able to recover the drugs. It is believed that because of the proximity of CCCC to public roadways, this type of activity is common, but usually goes undetected.

41.    Upon information and belief, CCCC employees have been responsible for drugs and contraband entering CCCC as well.

42.    On August 29, 2023, former CCCC Correction Officer (CO) Dennis Dean Garcia was sentenced to 24 months of imprisonment followed by three years of supervised release for attempting to provide contraband in prison.[2]

43.    Garcia, who was employed as a CO at CCCC from January 2019 until February 22, 2021, had been investigated after monitors of surveillance video at CCCC observed Garcia remove something from his pocket and place it in a storage room. The item contained 104 grams of methamphetamine.[3]

44.    During the FBI's investigation of CCCC, investigators were told by approximately two dozen sources from within the facility that certain corrupt COs would regularly smuggle drugs and other contraband into CCCC for inmates.

45.    One source reported knowing a CO who would hide drugs in his boot to bring them into CCCC. The CO would then deliver the drugs to an inmate by dropping the package into the cell during a "search," outside the view of surveillance cameras.

46.    FBI investigators also learned of a former captain and shift supervisor at CCCC who had been actively involved in drug trafficking while at CCCC. Allegedly, the captain worked with several porters—inmates who would distribute drugs around the facility. When drugs were found in an inmate's cell by COs, this captain directed the officers to refrain from field testing the drugs and then deleted photo and video evidence of the drugs.

---

[2] See Press Release, *Former USMS Detention Officer Sentenced for Attempt to Provide Contraband in Prison*, U.S. Dept. of Justice, Office of the Inspector General (Aug. 29, 2023), https://oig.justice.gov/news/press-release/former-usms-detention-officer-sentenced-attempt-provide-contraband-prison.

[3] See Press Release, *Former corrections officer arraigned on drug trafficking and contraband charges*, U.S. Attorney's Office, District of New Mexico (Feb. 3, 2022), https://www.justice.gov/usao-nm/pr/former-corrections-officer-arraigned-drug-trafficking-and-contraband-charges.

47.    The transfer of drugs and other contraband is sometimes achieved by hiding the contraband inside food carts. CCCC facilitates distribution of contraband by permitting the free movement of carts between pods without supervision.

48.    On November 1, 2024, the U.S. Attorney's Office, District of New Mexico, announced a major "dismantling" of the drug trafficking network associated with CCCC.[4] The joint operation included multiple search warrants, indictments, and arrests.

49.    On January 25, 2025, Michael "Gomer" Ernest Garcia was arrested in connection with the FBI investigation of drug trafficking at CCCC.[5]

50.    Upon information and belief, multiple individuals in CCCC custody have lost their lives in recent years due to drugs that were brought into CCCC illegally. In June 2021, a male detainee was discovered dead in his cell at CCCC. The Office of Medical Investigator (OMI) determined that this detainee died from the toxic effects of fentanyl, methamphetamine, and morphine. On November 14, 2021, Jasmine Williams was discovered dead in her cell. Her death was also determined to be caused by the toxic effects of fentanyl and other drugs.

51.    Defendants Snodgrass and Bullock, as supervisory correctional staff, knew or should have known about the prevalence of drug smuggling at CCCC, but failed to take appropriate steps to ensure the flow of drugs into the facility stopped.

---

[4] *See* Press Release, *U.S. Attorney's Office, FBI and USMS Target Drug Trafficking Operation Linked to Federal Correctional Facility,* U.S. Attorney's Office, District of New Mexico (Nov. 1, 2024), https://www.justice.gov/usao-nm/pr/us-attorneys-office-fbi-and-usms-target-drug-trafficking-operation-linked-federal-0.

[5] *See* Press Release, *U.S. Attorney's Office, FBI and USMS Disrupt Contraband Operation at Cibola County Correctional Center with Arrest,* U.S. Attorney's Office, District of New Mexico (Jan. 25, 2025), https://www.justice.gov/usao-nm/pr/us-attorneys-office-fbi-and-usms-disrupt-contraband-operation-cibola-county-correctional.

52.    Defendants Snodgrass and Bullock, as supervisory correctional staff, knew or should have known about the prevalence of drug smuggling at CCCC, but failed to take appropriate steps to ensure inmates ceased the use of illicit drugs.

*Dominck Milia*

53.    Mr. Milia repeatedly requested medical help for his severe pain and worsening condition for nearly thirty-four (34) days before he lost the ability to walk or care for his basic needs before Defendants finally transferred him to outside medical care.

54.    At the time that Mr. Milia began complaining of his medical injuries, he was 45 years old and imprisoned at CCCC, in Milan, New Mexico and in the custody of CivicCore. On March 11, 2022, he passed away due to an infection causing endocarditis.

55.    While incarcerated at Cibola County Correctional Center ("CCCC") Mr. Milia had a history of intravenous drug use that made him especially susceptible to dangerous infections like endocarditis, and this history was known to CoreCivic and Cibola General Hospital staff and agents through Mr. Milia's prison file and communication between medical staff working for and with Defendants.

56.    On January 24, 2022, Mr. Milia was seen by CCCC medical staff for severe pain and throbbing in his left foot, which he indicated was a severity level of 10/10. He notified CCCC medical staff that it was painful to walk and even to recline in bed. Additionally, he informed CCCC medical staff that his only treatment for the pain has been allopurinol (a prescription of uric acid reducer, commonly used to treat gout and kidney stones), which was not effective to relieve his severe pain.

57.     In response to Mr. Milia's severe pain, CCCC medical staff merely increased the amount of allopurinol prescribed, provided him with an anti-inflammatory, and instructed him to drink more water, avoid eating cheese and sausage, elevate his foot, and avoid prolonged standing.

58.     Upon information and belief, Mr. Milia experienced a mini stroke on February 4, 2022, and CCCC medical staff failed to document (or preserve documents of) the emergency.

59.     On February 6, 2022, Mr. Milia submitted an emergency sick call request writing: "I need to see a Dr. ASAP for the mini stroke I just had on 2/4/22. I went to the hospital and need medical treatment ASAP." Despite the urgency of this sick call request, CCCC medical staff did not review it until February 8, 2022 – two days later.

60.     Later on, February 6, 2022, - after submitting his emergency sick call request, which remained unreviewed – Mr. Milia was brought to the CCCC medical unit in a wheelchair after experiencing another stroke. CCCC medical staff noted that his face was leaning to the left side, the left side of his face was drooping, and he was unable to raise his arms in front of him. Additionally, CCCC medical staff noted that his left pupil was larger than his right pupil and he was slurring his speech. In this visit, Mr. Milia informed CCCC medical staff that he had fallen after experiencing dizziness upon standing.

61.     Notably, despite the severity of Mr. Milia's injuries, the corresponding "Facility Emergency Anatomical Form" was incomplete, affirming that his injuries were found but leaving blank the portion of the form where an explanation of these injuries were required.

62.     Defendants Snodgrass and Bullock were aware of Mr. Milia's severely deteriorating condition and need for medical care, but failed to respond, or ensure he was able to access medical personnel.

63.    In response, he was transferred via ambulance to Cibola General Hospital for emergency care. Upon his arrival, hospital staff noted that Mr. Milia had experienced a syncopal episode (fainting) and forehead abrasion. Hospital staff also noted in Mr. Milia's records, which were added to his prison medical file, that his current prescriptions provided by CCCC medical staff were not improving his pain or symptoms.

64.    Mr. Millia was seen by Attending Physician, Ginger Vaughan, MD, at Cibola General Hospital.

65.    Mr. Milia underwent an electrocardiogram ("ECG"), which showed deviations from normal sinus rhythm, and right ventricular conduction delay, which is indicative of impaired conduction with the right bundle branch of the heart.  Such causes can be from heart failure, coronary artery disease, or other serious factors.

66.    Diziness or fainting can be a symptom of an underlying heart condition.

67.    Despite these warning signs, and despite knowledge of Mr. Milia's dire medical state and inadequate prescriptions, Cibola General Hospital immediately released him back into the prison population without providing adequate care or taking steps to ensure that he received minimally adequate care upon his return to CCCC.

68.    Cibola General Hospital and Defendant Vaughn knew or should have known that releasing Mr. Milia back to the prison would make it significantly difficult for him to ever return to the hospital.

69.    On February 16, 2022, Mr. Milia submitted a second sick call request stating that he had just experienced a stroke and needed a wheelchair because he could not walk. He noted that he had been unable to walk for at least eleven days. Despite the severity of Mr. Milia's medical

condition, no CCCC medical staff even reviewed this request until February 21, 2022 – five days later.

70.    On February 21, 2022, Mr. Milia informed CCCC medical staff that he could not walk or stand without experiencing a pain of 9/10. He emphasized that he needed a wheelchair. However, despite his severe pain and recent emergency room visit, CCCC medical staff provided him with no medication, treatment, or wheelchair. In his "Facility Emergency" chart, the medication and treatment section was left blank, and CCCC medical staff noted that none was given. Later that day, Mr. Milia was prescribed Naproxen for his pain and issued crutches or a walker, but CCCC medical staff refused to issue an order for him to receive a wheelchair.

71.    Alarmingly, CCCC medical staff then proceeded to deny Mr. Milia access to the Naproxen they had just prescribed because he was unable to get up and stand in the line to receive his medications. Rather than assist Mr. Milia in obtaining his pain medication, CCCC medical staff simply completed a "Refusal to Accept Medical Treatment" form, which Mr. Milia did not sign and noted that he did not receive his Naproxen because he was unable to stand in the medical line-the very issue that the Naproxen was prescribed to address.

72.    On February 24, 2022, Mr. Milia submitted another sick call request to CCCC medical staff, writing that he had recently had a stroke and was given a walker but still could not walk. He emphasized that he needed medication and that he was being neglected. On the sick call request form, he indicated that he had been experiencing these problems for three weeks. In exasperation, he wrote that he had previously submitted a sick call request on February 9, 2022-over two weeks prior-"and still nothing!!" In a desperate plea, Mr. Milia wrote: "I need help!!!"

73.    On February 25, 2022, Mr. Milia complained to CCCC medical staff that he was so weak he was unable to walk even with the assistance of a walker and was experiencing rapid

weight loss of approximately 25 pounds within four weeks. Mr. Milia further informed medical staff that he was experiencing back pain and night sweats. CCCC medical staff noted that he looked "ashen."

74.    Despite these alarming symptoms, Mr. Milia was provided with no medical care in response. He was merely referred to a nurse practitioner and placed under further observation. There is no indication that Mr. Milia was ever seen by the nurse practitioner to which he was referred.

75.    Defendants Snodgrass and Bullock were aware of Mr. Milia's deteriorating condition, and despite owing a duty of care to ensure Mr. Milia had access to medical care, they failed to do anything.

76.    Defendants Snodgrass and Bullock had the ability and authority to obtain emergency medical care for an inmate in a crisis, but despite this, they failed to do anything, including failed to ensure Mr. Milia received medical attention.

77.    On February 27, 2022, CCCC staff found Mr. Milia lying in his bed with pale skin labored breathing, and a rapid heart rate, unable to communicate, open his eyes, follow instructions, or move his arms. He had a temperature of 101.8 degrees Fahrenheit. He was transferred to CCCC's medical unit and given an oxygen mask but was not alert and remained unable to communicate. CCCC medical staff noted that Mr. Milia had a "low erratic heart rate" and was "non responsive" and "non verbal."

78.    Eventually, Emergency Medical Services was called to transport Mr. Milia to the University of New Mexico ("UNMH") for emergency medical care. By this point in time, Mr. Milia had been experiencing an altered physical state for several weeks.

79.    While at UNMH Mr. Milia received a diagnosis of endocarditis, a life-threatening inflammation of the inner lining of the heart's chambers and valves.

80.    On March 5, 2022, UNMH informed CCCC medical staff that Mr. Milia was "declining" and "could no longer move his left arm or leg." Hospital staff noted concern that he "may not be able to last much longer due to the decline."

81.    In conducting its postmortem examination of Mr. Milia, the University of New Mexico Office of Medical Investigator noted that there was evidence that Mr. Milia was "diagnosed with a stroke and sent back to jail… with changes in his speech and mobility." This reckless and improper transfer was initiated by Cibola General Hospital and approved by CoreCivic.

82.    The New Mexico Office of the Medical Investigator determined that Mr. Milia died on March 11, 2022, from "[c]omplications of infective endocarditis… a bacterial infection of the heart valves, in this case caused by the pseudomonas bacteria."

83.    Mr. Milia's infective endocarditis only emerged and became unmanageable and life-threatening due to the medical neglect and recklessness of CoreCivic medical staff at CCCC and agents of Cibola General Hospital.

84.    In light of these facts, it is clear that, together, CoreCivic and Cibola General Hospital, and their agents: Failed to properly monitor Mr. Milia's medical conditions, failed to provide proper medication, failed to refer Mr. Milia for higher/specialty care in a timely manner, and caused significant and inexcusable delay in the diagnosis of Mr. Milia's severe endocarditis.

85.    Overall, the medical care provided to Mr. Milia under CoreCivic's and Cibola General Hospital's care was so grossly deficient as to amount to no medical care at all.

## I.    CORECIVIC DEMONSTRATED A PERSISTENT AND WIDESPREAD PATTERN AND PRACTICE OF DELIBERATE INDIFFERENCE

**TO THE SERIOUS MEDICAL NEEDS OF PRISONER PATIENTS UNDER ITS CARE, AND THIS PRACTICE WAS THE MOVING FORCE BEHDIND MR. MILIA'S DEATH.**

86.    CoreCivic maintained various widespread patterns and practices which violated Mr. Milia's constitutional rights and contributed to his severe injuries, including:

a.    failing to establish, maintain, and enforce proper evaluation, diagnosis, and treatment guidelines and standards;

b.    failing to evaluate, treat, and manage Mr. Milia's medical conditions;

c.    failing to refer Mr. Milia to appropriate specialists and individuals who had the ability to timely diagnose and treat his medical conditions;

d.    failing to develop, employ, and follow appropriate policies and procedures regarding the assessment, treatment, and management of Mr. Milia' s medical history, intravenous drug use history, and consequent risks of infection and endocarditis;

e.    failing to provide Mr. Milia with necessary and proper pain management and mobility aids;

f.    failing to take reasonable steps to provide Mr. Milia with his prescription medications and ordered medical procedures; and

g.    failing to protect and preserve the health and safety of Mr. Milia.

87.    In essence, CoreCivic's medical care of prisoners effectively amounted to no medical care at all. *Kikumura v. Osagie*, 461 F.3d 1269, 1295 (10th Cir. 2006) (finding sufficient deliberate indifference allegations where "the medical treatment [plaintiff] received was merely a façade…[and] so cursory as to amount to no treatment at all.") (internal cites and quotes omitted); *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) ("[D]eliberate indifference to inmates' health needs may be shown by… proving there are such systemic and gross deficiencies in staffing,

facilities, equipment or procedure that the inmate population is effectively denied access to adequate medical care.").

88.     CoreCivic has failed to report, diagnose, and treat the warning signs of serious conditions for many other patients in circumstances similar to those of Mr. Milia. These failures are reflected in the following non-exhaustive list of cases:

- In *Kimberly Ann Krantz, as personal representative for the estate of Justin Krantz v. CoreCivic et al.*, No. D-202-CV-2023-09059 (N.M. 2nd Dist. Ct.), CoreCivic failed to treat the warning signs of Mr. Krantz's suicidal ideations after failing to provide him with any medication for several days.

- In *Alejandro M Balderrama v. CoreCivic Of Tennessee, LLC, et al.*, No. D-1333-CV-2024-00197 (N.M. 13th Dist. Ct.), CoreCivic failed to report and treat signs of worsening injuries which included a fever, pain and swelling in the foot and ankle with a severe infection in both hands and rights food, and leg and bloody urine.

- In *Kamal Bhula v. CoreCivic, Inc., et al.*, No. D-202-CV-2022-07554 (N.M. 2nd Dist. Ct.), CoreCivic failed to diagnose a tumor and failed to refer the patient to an outside provider in a timely manner, resulting in a long-term tumor to grow.

- In *Guy Bryan v. CoreCivic, Inc., et al.*, No. D-202-2022-00553 (N.M. 2nd Dist. Ct.), CoreCivic failed to diagnose and treat Mr. Bryan's broken collarbone and failed to refer him to an outside provider in a timely manner, resulting in no apparent callus formation which is the sign that a facture is not healing. An unhealed collarbone can lead to a more invasive surgery to fix the fracture later.

89.    The preceding cases and others illustrate CoreCivic's persistent refusal to refer prisoner patients to third-party medical providers for the provision of a higher level of care unavailable through CoreCivic.

90.    The following information, outlined in various news articles and cases, has publicly documented CoreCivic's widespread practices of improper reporting, diagnosing, monitoring, examining, treating, and referring prisoner patients for off-site services:

• On December 9, 2024, New Mexico Immigrant Law Center a Complaint and Request for Investigation of Medical Neglect at CCCC, for which "Both the U.S. Constitution and the 2011 Performance-Based National Based Standards (PBNDS) set forth clear requirements to protect detained migrants, to which CoreCivic and ICE must adhere at CCCC and TCDF."[6]

• On September 21, 2022, Prison Legal News spoke up about the two lawsuits against CoreCivic, "accuse the company of intentionally understaffing the four prisons it runs in Tennessee to boost profits for shareholders, holding costs at bay by refusing to seek outside medical care for ailing inmates, ignoring drug smuggling by its own guards and failing to keep inmates safe."[7]

• On February 16, 2021, ACLU New Mexico recalled an article from The Nation which exposed evidence of medical neglect at Cibola County Correction Center.[8]

---

[6] https://www.nmilc.org/press-release-archive/cibola-county-medical-neglect

[7] https://www.prisonlegalnews.org/in-the-news/2022/private-prison-contractor-corecivic-hit-two-new-lawsuits-over-inmate-deaths/

[8]   https://www.aclu-nm.org/en/news/new-mexico-can-no-longer-shirk-responsibility-end-profit-detention

91.     The Preceding cases and articles, among others, also establish that CoreCivic and Cibola Country General Hospital were on notice of these widespread unconstitutional practices prior to Mr. Milia's injuries and thereby knew that additional safeguards should have been put in place to address patients' signs of serious medical conditions.

92.     Accordingly, it can be readily inferred that CoreCivic intentionally failed to report, diagnose, and treat these serious warning signs despite the known and obvious risk to patient safety. And Cibola General Hospital intentionally failed to provide report, diagnose, and treat these serious warning signs despite the known and obvious risk to patient safety.

93.     CoreCivic's widespread practice of failing to report, diagnose, and treat the warning signs of serious medical conditions shares a close factual relationship with the events in Mr. Milia's case, and accordingly, the widespread practice was the moving force behind his injuries and near-death experiences.

94.     Significantly, CoreCivic's personnel failed to conduct diagnostic and physical examinations multiple times in Mr. Milia's case alone, which establishes a pattern and practice of insufficient reporting, diagnosis, and treatment of serious medical conditions.

95.     As such, CoreCivic's policy and practice of failing to report, diagnose, and treat warning signs of serious medical conditions caused the injuries and death of Mr. Milia.

96.     CoreCivic failed to provide adequate medical documentation and failed to communicate changes in patient conditions for many other patients in circumstances similar to those of Mr. Milia.

97.     Likewise, in Mr. Milia's case, CoreCivic failed to provide adequate medical documentation and failed to communicate important changes in Mr. Milia's medical condition to providers who had the ability to appropriately treat his condition.

## CLAIMS FOR RELIEF

### COUNT I
**VIOLATION OF 42 U.S.C. § 1983**
**DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS**
**(Against Defendants CoreCivic, CMA, Ivens, Snodgrass, Bullock, and Nilius)**

98.    Each paragraph of this Complaint is incorporated as if fully restated herein.

99.    At all relevant times, Dominic Milia was a pretrial detainee housed at Cibola County Correctional Center (CCCC), making his constitutional rights protected under the Fourteenth Amendment.

100.    The abovementioned Defendants each possessed responsibility for the decisions that resulted in the violation of Mr. Milia's constitutional rights to be free from cruel and unusual punishment regarding the deliberate indifference to his serious medical needs while in CoreCivic custody, as described more fully above.

101.    These Defendants were aware of and deliberately disregarded the substantial risk of harm to Mr. Milia that would ensue because of their failures to provide him with constitutionally adequate medical care, as described more fully above.

102.    Notably, each of the abovenamed Defendants were aware of Mr. Milia's severe and escalating pain, yet took essentially no action to address this anguish, which constitutes deliberate indifference to his pain and deteriorating medical condition.

103.    The deliberate indifference of the abovenamed Defendants caused Mr. Milia to experience worsening severe, prolonged and unnecessary pain (first harm), to develop severe endocarditis (second harm), and to suffer from delayed diagnosis of severe endocarditis (third harm), which ultimately caused multiorgan failure and required emergency surgeries due to the severity.

104.    Mr. Milia's harms were sufficiently serious injuries that a reasonable doctor or patient would find them important and worthy of immediate treatment. Without treatment, Mr. Milia's worsening severe pain caused him to lose the ability to take care of his most basic needs and restricted his ability to walk, however he was never provided a wheelchair.

105.    Moreover, Mr. Milia's severe pain of endocarditis significantly affected his daily activities, as he lost the ability to care for even his most basic needs and struggled through pain while completing basic tasks like standing up, walking, and lying down.

106.    Defendants were deliberately indifferent to Mr. Milia's serious medical needs by failing to provide adequate medical care, ignoring his worsening condition, and failing to transport him to a hospital for timely treatment.

107.    Defendant Ivens refused to authorize necessary hospital treatment, directly contributing to Mr. Milia's death.

108.    Defendants Snodgrass and Bullock, as supervisory correctional staff, knew or should have known about Mr. Milia's deteriorating condition and failed to intervene.

109.    Defendant Nilius, as Warden, failed to maintain policies and oversight to ensure detainees received proper medical treatment.

110.    Defendants acted with deliberate indifference to Mr. Milia's serious medical needs, violating his Fourteenth Amendment rights.

111.    As a direct and proximate result of Defendants' deliberate indifference, Mr. Milia suffered unnecessary pain, suffering, and ultimately death. Plaintiff therefore seeks compensatory and punitive damages, attorneys' fees, and all other appropriate relief under 42 U.S.C. § 1983.

## COUNT II
## VIOLATION OF 42 U.S.C. § 1983

## FAILURE TO PROTECT FROM HARM
### (Against Defendants CoreCivic, CMA, Ivens, Snodgrass, Bullock, and Nilius)

112.    Each paragraph of this Complaint is incorporated as if fully restated herein.

113.    Defendants had a duty to ensure Mr. Milia's safety and protect him from known dangers, including drug exposure, improper segregation, and inadequate medical treatment.

114.    Defendants knew or should have known that CCCC had an ongoing issue with drug trafficking and that Mr. Milia, a detainee was vulnerable to harm.

115.    Despite this knowledge, Defendants failed to take reasonable steps to ensure Mr. Milia's safety.

116.    Defendant Snodgrass and Bullock refused to take appropriate measures when alerted that Mr. Milia was experiencing distress.

117.    Defendants Ivens refused to provide medical intervention despite clear signs that Mr. Milia was in medical crisis.

118.    Defendant Nilius failed to implement policies to protect detainees from harm.

119.    As a private corporation acting pursuant to its agreement with CCCC to provide medical services to New Mexico State prisoners, CoreCivic was at all times relevant to the events described in this Complaint acting under color of law and, as the provider of healthcare services to prisoners incarcerated at CCCC, was responsible for the creation, implementation, oversight, and supervision of all policies and procedures followed by employees and agents of CoreCivic.

120.    As a direct and proximate result of Defendants' actions and inactions, Mr. Milia suffered severe harm and ultimately died. **Plaintiff therefore seeks compensatory and punitive damages, attorneys' fees, and all other appropriate relief under 42 U.S.C. § 1983.**

## COUNT III
### VIOLATION OF 42 U.S.C. § 1983
### UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT
**(Against Defendants CoreCivic, CMA, Ivens, Snodgrass, Bullock, and Nilius)**

121.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

122.    Defendants subjected Mr. Milia to unconstitutional conditions of confinement, including prolonged solitary confinement without proper medical oversight, inadequate nutrition and hydration, and denial of necessary medical care.

123.    The conditions Mr. Milia endured were objectively unreasonable and caused significant deterioration in his physical and mental health.

124.    Defendants' actions violated Mr. Milia's Fourteenth Amendment right to humane conditions of confinement.

125.    As a direct and proximate result, Mr. Milia suffered severe physical and mental distress leading to his death.

126.    Plaintiff therefore seeks compensatory and punitive damages, attorneys' fees, and all other appropriate relief under 42 U.S.C. § 1983.


## COUNT IV
### VIOLATION OF 42 U.S.C. § 1983
### UNCONSTITUTIONAL POLICIES, PRACTICES, OR CUSTOMS
### DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS UNDER *MONELL*
**(Against Defendants CoreCivic and CMA)**

127.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

128.    CoreCivic, Inc. and CMA were at all relevant times acting under color of and federal law in operating CCCC and providing medical services.

129.    CoreCivic, along with CMA, maintained policies, practices, and customs that led to the denial of necessary medical care to detainees, including but not limited to:

a. Medical Staffing Deficiencies – CoreCivic maintained chronic vacancies in key medical positions, including two FTE mental health practitioners, eight RN positions, and one FTE physician position, as documented in the ACA Reaccreditation Audit (Jan. 31 - Feb. 2, 2022).

b. Corporate-Controlled Medical Decisions – CoreCivic required that all significant medical decisions, including hospital transfers, be approved by an off-site corporate physician, delaying emergency care and resulting in preventable deaths.

c. Failure to Train and Supervise – CoreCivic failed to adequately train medical and correctional staff in recognizing and responding to medical distress.

d. Deliberate Indifference to Known Risks of Harm – CoreCivic was aware of prior deaths in the facility due to inadequate medical care, including detainees who died from drug overdoses after ingesting contraband smuggled into CCCC.

130.    These policies, customs, and deliberate failure to provide adequate medical care were the moving force behind Mr. Milia's death.

131.    As a direct and proximate result of Defendants' unconstitutional policies, Mr. Milia was denied necessary medical treatment, resulting in his preventable death in violation of his Fourteenth Amendment rights. Plaintiff therefore seeks compensatory and punitive damages, attorneys' fees, and all other appropriate relief under 42 U.S.C. § 1983.

## COUNT VII
## VIOLATION OF 42 U.S.C. § 1983 – DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS
### (Against Defendants Cibola General Hospital and Ginger Vaughn, M.D.)

132.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

133.    At all relevant times, Dominck Milia was a pretrial detainee whose constitutional rights were protected under the Fourteenth Amendment to the U.S. Constitution.

134.    Defendants Cibola General Hospital and Dr. Ginger Vaughn, M.D., were deliberately indifferent to Mr. Milia's serious medical needs, including his altered mental status, and serious medical conditions.

135.    Defendant Vaughn was aware that Mr. Milia was severely ill, yet she failed to conduct necessary medical testing, and / or ignored the results of medical testing that demonstrated that Mr. Milia necessitated a higher level of urgent care.

136.    Instead of admitting Mr. Milia and conducting additional testing, Defendant Vaughn simply discharged him back to CCCC.

137.    Defendants' failure to conduct appropriate testing, medical stabilization, providing urgent care resulted in Mr. Milia being discharged rather than treated as a patient in need of urgent medical care.

138.    Defendants acted in concert with CoreCivic and CMA officials and staff to facilitate Mr. Milia's rapid discharge back to CCCC rather than provide him with constitutionally adequate medical care.

139.    Defendant Vaughn and Cibola General effectively functioned as state actors, as they treated Mr. Milia pursuant to a contractual or customary relationship with CoreCivic, thereby assuming responsibility for his medical care while under correctional custody.

140.    As a direct and proximate result of Defendants' deliberate indifference, Mr. Milia was returned to CCCC in a medically unstable condition, and ultimately suffered a preventable death.

141.    Defendants' conduct violated Mr. Milia's clearly established constitutional rights under the Fourteenth Amendment to receive adequate medical care as a pretrial detainee.

142.    Plaintiff therefore seeks compensatory and punitive damages, attorneys' fees, and all other appropriate relief under 42 U.S.C. § 1983.

**COUNT VIII**
**VIOLATION OF 42 U.S.C. § 1983 – STATE-ACTION LIABILITY & CONSPIRACY TO DEPRIVE CONSTITUTIONAL RIGHTS**
**(Against Defendants Cibola General Hospital and Ginger Vaughn, M.D.)**

143.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

144.    Defendants Cibola General Hospital and Ginger Vaughn, M.D., acted jointly with CoreCivic and CCCC correctional officers to deprive Mr. Milia of his Fourteenth Amendment rights.

145.    Defendant Vaughan was aware that Mr. Milia was a pretrial detainee in CoreCivic custody, yet he failed to act as an independent medical provider, instead prioritizing the interests of CoreCivic over those of his patient.

146.    Rather than conducting independent medical assessments and ensuring appropriate treatment, Defendant Vaughan coordinated with CoreCivic staff to discharge Mr. Milia, rendering him further incapable of advocating for himself.

147.    Defendants' actions were performed under color of law because they knowingly participated in the premature discharge of Mr. Milia without ensuring his medical safety, effectively acting in concert with CoreCivic as state actors.

148.    Defendant Vaughan's deliberate indifference and cooperation with correctional authorities in restraining and discharging Mr. Milia without appropriate treatment constituted a conspiracy to deprive Mr. Milia of his constitutional rights.

149.    The conspiracy between Defendants Cibola General Hospital, Defendant Vaughan, and CoreCivic officials deprived Mr. Milia of necessary and urgent medical intervention, contributing to his deteriorating condition and ultimate death.

150.    As a direct and proximate result of Defendants' actions, Mr. Milia suffered prolonged distress, deprivation of medical care, and a preventable death.

151.    Defendants' actions violated Mr. Milia's clearly established constitutional rights under the Fourteenth Amendment, and Plaintiff seeks compensatory and punitive damages, attorneys' fees, and all other appropriate relief under 42 U.S.C. § 1983.

### COUNT IX
**VIOLATION OF 42 U.S.C. § 1983 – FAILURE TO PROVIDE REASONABLE ACCOMMODATIONS UNDER THE FOURTEENTH AMENDMENT**
**(Against Defendants Cibola General Hospital and Ginger Vaughn, M.D.)**

152.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

153.    Defendants Cibola General Hospital and Defendant Vaughn knew or should have known about Mr. Milia's disability, given his presentation of altered mental status and prior medical history.

154.    Despite this knowledge, Defendants failed to provide reasonable medical accommodations, including continued medical observation, or appropriate monitoring of potential adverse drug interactions.

155. Instead, Defendants discharged him back to CCCC, where he was at risk of serious harm due to his incapacitated state.

156. Defendants failed to ensure Mr. Milia had the ability to participate in medical decision-making, violating his substantive rights under the Fourteenth Amendment's Due Process Clause.

157. As a direct and proximate result of Defendants' actions, Mr. Milia was denied medical care and reasonable accommodations, leading to his deteriorating condition and ultimate death.

158. Defendants' conduct violated clearly established constitutional protections under the Fourteenth Amendment, and Plaintiff seeks compensatory and punitive damages, attorneys' fees, and all other appropriate relief under 42 U.S.C. § 1983.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all claims triable to a jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Estate of Dominick Milia, by and through Personal Representative Eugenio Mathis, respectfully requests that this Court enter judgment in Plaintiff's favor and grant the following relief:

1. Compensatory Damages

   a. For pain and suffering, mental anguish, emotional distress, and physical suffering endured by Dominick Milia before and leading up to his death;

      b.     For medical expenses incurred due to Defendants' unconstitutional and unlawful conduct; and

      c.     For loss of enjoyment of life and the dignitary harms suffered by Dominick Milia due to Defendants' violations of Mr. Milia's rights.

2.     Punitive Damages

      a.     Against individual Defendants acting under color of law in their personal capacities, pursuant to 42 U.S.C. § 1983, for their willful and malicious violations of Dominick Milia's constitutional rights; and

      b.     Against private entities (CoreCivic, Correctional Medicine Associates, and Cibola General Hospital) for reckless and willful disregard of Mr. Milia leading to Mr. Milia's suffering and death.

3.     Attorneys' Fees and Costs

      a.     Pursuant to 42 U.S.C. § 1988(b), which provides for the recovery of reasonable attorneys' fees for prevailing plaintiffs in civil rights cases under 42 U.S.C. § 1983.

4.     Prejudgment and Post-Judgment Interest at the maximum legal rate allowed by law, to fully compensate for the injuries sustained.

5.     Any Further Relief as this Court deems just and proper under law.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues in this case so triable.

Respectfully submitted,

31

GUEBERT GENTILE PIAZZA & JUNKER P.C.


By:*/s/Elizabeth M. Piazza, Esq.*
       Elizabeth M. Piazza
       Anne L. Kemp
       Post Office Box 93880
       Albuquerque, New Mexico 87199
       (505) 823-2300
       epiazza@guebertlaw.com
       akemp@guebertlaw.com


COLLINS & COLLINS, P.C.


By:*/s/Parrish Collins, Esq.*
       Parrish Collins
       Francheska Bardacke
       Post Office Box 506
       Albuquerque, New Mexico 87103
       (505) 242-5958
       parrish@collinsattorneys.com
       francheska@collinsattorneys.com